<hr />

(No. 2319—

LAWRENCE F. RAU, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed September 9, 1941.*
*Rehearing denied November 13, 1941.*

MARKMAN, DONOVAN & SULLIVAN, for claimant.

GEORGE F. BARRETT, Attorney General; GLENN A. TREVOR, Assistant Attorney General, for respondent.

CHIEF JUSTICE DAMRON delivered the opinion of the court:

Claimant's petition in this case consists of two counts. The first count alleges that claimant is the owner of a tract of land consisting of approximately 16.44 acres; that he specialized in growing onion plants, and that this particular land is particularly adapted for that purpose; that the average yield per pound of seed planted is nine bushels; that in 1933 he planted 1,000 pounds of seed, and avers from that he would ordinarily harvest 9,000 bushels of onion sets.

Paragraph 3 averred that this tract of land was provided with a system of adequate drains; that his system was connected with the Village system at a point a short distance south of the B. & O. Railroad tracks and at Halsted Street; that the main of the Village storm sewer system extends north up along Halsted and empties into the Calumet River, but it is not averred by what right, title or authority claimant's system was connected with the Village system.

In paragraph 4 it is averred that in October, 1932, the Department of Public Works and Buildings, Division of Highways, undertook the widening and paving of Halsted Street, a section of which extended from the Calumet River south and past claimant's land; that in the construction work necessary for improving Halsted Street it became necessary for the Highway Department to fill in and grade the widened roadway; that prior thereto there existed a ditch along the east side of Halsted Street which provided a natural drainage for the adjoining land; that when this ditch was filled and the street graded, the drainage for the adjoining land was destroyed, and thereafter the storm water flowed from the adjoining land and would accumulate along the highway as widened, and the Highway Department connected two catchbasins on the east side of the street about 275 yards apart north of the railroad tracks; that these catchbasins were not installed until after the street had been paved, and these catchbasins were connected with the main sewer which drained claimant's land. It is then averred that the engineers of the State Highway Department at the time of connecting the catchbasins had made observations and inquiry regarding this drainage system and learned that the systems and the main sewer were not adequate for its purpose and were in bad condition; that the sewer was so ancient that scarcely anyone knew of its history, but notwithstanding the investigation these highway engineers made connection with the catchbasins and thereby caused all storm water from the adjoining farm land to flow into the main sewer, and that the drainage of the storm water caused loose soil to be washed into the main sewer clogging that sewer at a point between claimant's land and a point south of 134th Street, and at the time of widening Halsted Street the State Highway Department made other connections for drainage waters from the widened highway extending south beyond claimant's land, and that all these

inlets and connections caused the drainage of water to flow into the main sewer which theretofore had drained in another direction and thereby overloaded the main sewer.

The averments contained in this paragraph are very significant in this, that it is stated that the engineers of the Highway Department had learned that the sewage system and main sewer were never adequate for its purpose, and had always been in a bad condition. The extent of this inadequacy was probably unknown to both the claimant and the Highway Department. This is particularly true in view of remaining averments contained in the petition in so far as the facts are concerned.

Paragraph 5 avers that the Highway Department from observation, inquiry and investigation knew the claimant's land was drained by the village drainage system and knew that the system in use was not adequate for the purpose of making connections therewith for the drainage of adjoining farm land which theretofore had been drained in another direction, and that in connecting additional catchbasins and inlets the sewage system would be overloaded and would be an interference with claimant's right to a free, proper and adequate drainage of his land.

Paragraph 6 states that in April, 1933, a heavy rain occurred which resulted in the flooding of land and that claimant reported this flood condition to the Village and that the Village made an investigation and found the main sewer was clogged and this was reported by the village engineer to the supervising engineer of the Division of Highways.

Paragraph 7 alleges that on May 20, 1933, to May 25, 1933, claimant planted on his land 1,000 pounds of seed and thereafter the seeds grew and reached the height of from four to six inches, showing uniform growth over the entire tract of land and gave promise of producing a better yield than for two years prior thereto.

In paragraph 8 it is averred that on July 2, 1933, a heavy rain flooded this tract and water accumulated and remained on the land for about a week; that claimant complained to the Village authorities and that upon investigation the engineer of the Village and the plumber of the Village discovered the main sewer of said Village system was stopped between a point south of 134th Street and a point south of the B. & O. Railroad tracks, and this stoppage was caused by

sand and dirt which had clogged the main sewer and which had entered the sewer through the catchbasins and connections aforesaid, but in view of the averments contained in paragraph 4 of the complaint that the sewer had been in bad condition before that time, we cannot determine how much or to what extent draining additional sewage into the existing system had brought about the stoppage.

In paragraph 9 it is stated that the overburdening of the sewer main, as hereinbefore stated, caused claimant's land to be flooded for a week or more, seriously damaging the onion crop; that the main sewer was clogged with loose dirt from the adjoining land and this prevented claimant's land from being drained and the flood waters remained in the land for a week or more, and that a large area of the growing plants was completely submerged for that period of time, which seriously damaged their growth; that after the water had drained the onion plants which had been flooded died, and there was harvested from said tract a total yield of 2,313 bushels of onion sets; that claimant's loss was 6,678 bushels, or 267,480 pounds of onion sets, being a loss in the sum of $18,000.00.

Thereafter this Court permitted an amendment to the addenda clause increasing the damages.

In paragraph 10 it is charged that the drainage system of this land had adequately drained the land which was connected with the main sewer of the Village drainage system prior to the interference of the Highway Department and other averments along this line are also contained in paragraph 10, and that the Highway Department of the State of Illinois had no right to construct a highway and interfere with the claimant's rights without making just compensation and that no compensation had been paid claimant, and that the State is bound, pursuant to the provisions of Section 13 of Article 2 of the Constitution, to pay claimant compensation damages as resulted to claimant by reason of the construction of the drainage system put in by the State.

Count 2 re-alleged paragraphs 1, 2, 3, and 4 of Count 1 of the complaint, and such paragraphs are made paragraphs 1, 2, 3 and 4 of Count 2.

Paragraph 5 of Count 2 alleges that in view of the knowledge acquired by inquiry and observation of the engineers of the State Highway Department to the effect that

the drainage system to which the aforesaid connections were made was ancient, inadequate and in a bad condition; that the State Highway Department was guilty of gross negligence and that the result of washing of loose dirt into the sewer main from the land which theretofore was turned in another direction, was an unlawful interference with claimant's property rights.

Paragraphs 6, 7, 8, 9, 10, 11 and 12 of Count 1 are re-alleged and made correspondingly paragraphs 6, 7, 8, 9, 10, 11 and 12 of Count 2. The allegations contained in paragraph 5 of Count 2 apply with equal force to the averments contained in paragraph 4 of Count 1, and we cannot see or determine the extent of the filling in of the sewer and are at a loss to understand why the State would be responsible in putting other waters into a sewer that was in bad condition and probably most closed to the passage of sewer water at the time of the heavy rains complained of.

The averments contained in Count 1 in effect constitute negligent acts upon the agents of the State Highway Department. The averments contained in paragraph 5 of Count 2 directly charges that the agents of the Highway Department, in view of their knowledge of the facts, constituted gross negligence. The Attorney General has made a motion to dismiss this suit on the ground that it is sought to recover damages caused by alleged negligence of employees of respondent in constructing and maintaining a highway and therefore respondent, or the State, is not liable for such damage so caused.

Both sides have extensively argued this proposition. It is argued by the Attorney General that the State cannot be sued in an action at law for damages caused by the alleged negligence of its agents and servants. Much evidence was taken, and this evidence is to be interpreted along with the law, and it is said by the Attorney General that the evidence was taken for the purpose of being considered by the court for the reason that possibly the questions of law arising on the complaint may be more easily and clearly understood.

It is charged in paragraph 11 of the complaint that the Attorney for claimant made his claim to the Highway Department for compensation and the secretary of this department told him to file his claim with this court. This, of course, could not, as a matter of law, give this court any jurisdiction

that it did not have without such direction to claimant's counsel. Such direction does not have the force and effect of a legislative action giving this court jurisdiction.

We have gone over the evidence, and it does not conclusively appear that prior to the time of this improvement a ditch existed on the east side of the road adjoining claimant's property which provided a satisfactory drainage to his land and that the State filled in said ditch causing water to accumulate along the highway. As a matter of fact, there is strong and convincing proof that a ditch did not exist on the east side of the road and consequently the drainage conditions were not interfered with by the State's construction of this improvement, and the evidence bears out the averments in the complaint that the sewer never was adequate for its purposes and had been in bad condition a long time prior to the time that the State constructed this improvement, and it is exceedingly doubtful that the sewer was disturbed by the State's construction in any way, and there is much in the evidence to lead one to conclude that the sewer in question was badly clogged before the manholes referred to in the complaint were constructed; but as we view it, the questions raised here are questions of law and we merely make reference to the proof to show that even though this case was to be decided upon the facts claimant alleges, damages were at least very uncertain.

It has frequently been the holding of this court that in the construction and maintenance of its roads, the State acts in a governmental capacity and in the exercise of such governmental functions it does not become liable in actions of tort by reason of the malfeasance, misfeasance or negligence of its officers or agents in the absence of a Statute creating such liability. The first of these cases was that of *Morrissey* vs. *State*, 2 C. C. R. 254.

This case for claimant was exhaustively presented by eminent counsel, and has been followed since that time by this court.

The Supreme Court of Illinois, in the case of *Minear* vs. *State Board of Agriculture*, 259 Ill. 549, announced a similar rule, and other cases of the Supreme and Appellate Courts of this State are in harmony.

The General Assembly of this State has never enacted a law making the State liable for damages caused by negli-

14

gent construction of a public road, and this court has no power to make an award for such damages in the absence of such a statute.

Award denied. Case dismissed.