(No. 35249.—
Norma Molitor *et al.* *vs.* Kaneland Community Unit District No. 302, Appellee.—(Thomas Molitor, Appellant.)

*Opinion filed December 16, 1959.*

12

Davis and Hershey, JJ., dissenting.
Bristow, J., concurring and dissenting in part.

Reid, Ochsenschlager, Murphy & Hupp, of Aurora, (Frank R. Reid, Jr., L. M. Ochsenschlager, William C. Murphy, Robert B. Hupp, and William J. Foote, of counsel,) for appellant.

Matthews, Jordon, Dean & Suhler, of Aurora, Burrell & Holtan, of Freeport, and Carbary & Carbary, of Elgin, (John T. Matthews, David M. Burrell, and Roger W. Eichmeier, of counsel,) for appellee.

Mr. Justice Klingbiel delivered the opinion of the court:

Plaintiff Thomas Molitor, a minor, by Peter his father and next friend, brought this action against Kaneland Com-

munity Unit School District for personal injuries sustained by plaintiff when the school bus in which he was riding left the road, allegedly as a result of the driver's negligence, hit a culvert, exploded and burned.

The complaint alleged, in substance, the negligence of the School District, through its agent and servant, the driver of the school bus; that plaintiff was in the exercise of such ordinary care for his own safety as could be reasonably expected of a boy of his age, intelligence, mental capacity and experience; that plaintiff sustained permanent and severe burns and injuries as a proximate result of defendant's negligence, and prayed for judgment in the amount of $56,000. Plaintiff further alleged that defendant is a voluntary unit school district organized and existing under the provisions of sections 8—9 to 8—13 of the School Code and operates school buses within the district pursuant to section 29—5. Ill. Rev. Stat. 1957, chap. 122, pars. 8—9 to 8—13 and par 29—5.

The complaint contained no allegation of the existence of insurance or other nonpublic funds out of which a judgment against defendant could be satisfied. Although plaintiff's abstract of the record shows that defendant school district did carry public liability insurance with limits of $20,000 for each person injured and $100,000 for each occurrence, plaintiff states that he purposely omitted such an allegation from his complaint.

Defendant's motion to dismiss the complaint on the ground that a school district is immune from liability for tort was sustained by the trial court, and a judgment was entered in favor of defendant. Plaintiff elected to stand on his complaint and sought a direct appeal to this court on the ground that the dismissal of his action would violate his constitutional rights. At that time we held that no fairly debatable constitutional question was presented so as to give this court jurisdiction on direct appeal, and accordingly the cause was transferred to the Appellate Court for

the Second District. The Appellate Court affirmed the decision of the trial court and the case is now before us again on a certificate of importance.

In his brief, plaintiff recognizes the rule, established by this court in 1898, that a school district is immune from tort liability, and frankly asks this court either to abolish the rule *in toto,* or to find it inapplicable to a school district such as Kaneland which was organized through the voluntary acts of petition and election by the voters of the district, as contrasted with a school district created *nolens volens* by the State.

With regard to plaintiff's alternative contention, we do not believe that a logical distinction can be drawn between a community unit school district organized by petition and election of the voters of the district pursuant to article 8 of the School Code, (Ill. Rev. Stat. 1957, chap. 122, pars. 8—9 to 8—13,) and any other type of school district, insofar as the question of tort liability is concerned. All are "quasi-municipal corporations" created for the purpose of performing certain duties necessary for the maintenance of a system of free schools. The reasons for allowing or denying immunity apply equally to all school districts without regard to the manner of their creation. We are unwilling to further complicate the law relating to governmental torts by now drawing highly technical distinctions between the various types of Illinois school districts and making tort liability depend thereon.

Thus we are squarely faced with the highly important question—in the light of modern developments, should a school district be immune from liability for tortiously inflicted personal injury to a pupil thereof arising out of the operation of a school bus owned and operated by said district?

It appears that, while adhering to the old immunity rule, this court has not reconsidered and re-evaluated the doctrine of immunity of school districts for over fifty years. During these years, however, this subject has re-

ceived exhaustive consideration by legal writers and scholars in articles and texts, almost unanimously condemning the immunity doctrine. See, Borchard, Governmental Liability in Tort, 34 Yale L. J. 1; Green, Freedom of Litigation, 38 Ill. L. Rev. 355; Harno, Tort Immunity of Municipal Corporation, 4 Ill. L. Q. 28; Prosser on Torts, chap. 21, sec. 108, p. 1063; Pugh, Historical Approach to the Doctrine of Sovereign Immunity, 13 La. L. Rev. 476; Repko, American Legal Commentary on the Doctrines of Municipal Tort Liability, 9 Law and Contemporary Problems 214; Rosenfield, Governmental Immunity from Liability for Tort in School Accidents, 5 Legal Notes on Local Government 380; Approaches to Governmental Liability in Tort, 9 Law and Contemporary Problems 182; Note: Limitations on the Doctrine of Governmental Immunity from Suit, 41 Col. L. Rev. 1236; Note: The Sovereign Immunity of the States, The Doctrine and Some of Its Recent Developments, 40 Minn. L. Rev. 234; Tort Claims Against the State of Illinois and Its Subdivisions, 47 N.W. L. Rev. 914.

Historically we find that the doctrine of the sovereign immunity of the state, the theory that "the King can do no wrong," was first extended to a subdivision of the state in 1788 in *Russell* v. *Men of Devon*, 2 Term Rep. 671, 100 Eng. Rep. 359. As pointed out by Dean Prosser (Prosser on Torts, p. 1066), the idea of the municipal corporate entity was still in a nebulous state at that time. The action was brought against the entire population of the county and the decision that the county was immune was based chiefly on the fact that there were no corporate funds in Devonshire out of which satisfaction could be obtained, plus a fear of multiplicity of suits and resulting inconvenience to the public.

It should be noted that the *Russell case* was later overruled by the English courts, and that in 1890 it was definitely established that in England a school board or school district is subject to suit in tort for personal injuries on

the same basis as a private individual or corporation. (*Crisp v. Thomas,* 63 L. T. N. S. 756 (1890).) Non-immunity has continued to be the law of England to the present day. See: Annotation, 160 A.L.R. 7, 84.

The immunity doctrine of *Russell* v. *Men of Devon* was adopted in Illinois with reference to towns and counties in 1870 in *Town of Waltham* v. *Kemper,* 55 Ill. 346. Then, in 1898, eight years after the English courts had refused to apply the *Russell* doctrine to schools, the Illinois court extended the immunity rule to school districts in the leading case of *Kinnare* v. *City of Chicago,* 171 Ill. 332, where it was held that the Chicago Board of Education was immune from liability for the death of a laborer resulting from a fall from the roof of a school building, allegedly due to the negligence of the Board in failing to provide scaffolding and safeguards. That opinion reasoned that since the State is not subject to suit nor liable for the torts or negligence of its agents, likewise a school district, as a governmental agency of the State, is also "exempted from the obligation to respond in damages, as master, for negligent acts of its servants to the same extent as is the State itself." Later decisions following the *Kinnare* doctrine have sought to advance additional explanations such as the protection of public funds and public property, and to prevent the diversion of tax moneys to the payment of damage claims. *Leviton* v. *Board of Education,* 374 Ill. 594; *Thomas* v. *Broadlands Community Consolidated School Dist.* 348 Ill. App. 567.

Surveying the whole picture of governmental tort law as it stands in Illinois today, the following broad outlines may be observed. The General Assembly has frequently indicated its dissatisfaction with the doctrine of sovereign immunity upon which the *Kinnare case* was based. Governmental units, including school districts, are now subject to liability under the Workmen's Compensation and Occupational Disease Acts. (Ill. Rev. Stat. 1957, chap. 48, pars. 138.1, 172.36; *McLaughlin* v. *Industrial Board,* 281 Ill. 100; *Board of Education* v. *Industrial Com.* 301 Ill. 611.)

The State itself is liable, under the 1945 Court of Claims Act, for damages in tort up to $7,500 for the negligence of its officers, agents or employees. (Ill. Rev. Stat. 1957, chap. 37, pars. 439.1-439.24.) Cities and villages have been made directly liable for injuries caused by the negligent operation of fire department vehicles, and for actionable wrong in the removal or destruction of unsafe or unsanitary buildings. (Ill. Rev. Stat. 1957, chap. 24, pars. 1—13, 1—16.) Cities and villages, and the Chicago Park District, have also been made responsible, by way of indemnification, for the nonwilful misconduct of policemen. (Ill. Rev. Stat. 1957, chap. 24, par. 1—15.1; chap. 105, par. 333.23K.) In addition to the tort liability thus legislatively imposed upon governmental units, the courts have classified local units of government as "quasi-municipal corporations" and "municipal corporations." And the activities of the latter class have been categorized as "governmental" and "proprietary," with full liability in tort imposed if the function is classified as "proprietary." The incongruities that have resulted from attempts to fit particular conduct into one or the other of these categories have been the subject of frequent comment. Rhyne, Municipal Law, p. 732; Phillips, "Active Wrongdoing" and the Sovereign-Immunity Principle in Municipal Tort Liability, 38 Ore. L. Rev. 122, 124; Davis, Tort Liability of Governmental Units, 40 Minn. L. Rev. 751, 774; Note, Tort Claims Against the State of Illinois and Its Subdivisions, 47 N.W. L. Rev. 914, 921; Green, Freedom of Litigation (III): Municipal Liability for Torts, 38 Ill. L. Rev. 355. See also *Roumbos v. City of Chicago,* 332 Ill. 70.

Of all of the anomalies that have resulted from legislative and judicial efforts to alleviate the injustice of the results that have flowed from the doctrine of sovereign immunity, the one most immediately pertinent to this case is the following provision of the Illinois School Code: "Any school district, including any non-high school district, which provides transportation for pupils may insure

against any loss or liability of such district, its agents or employees, resulting from or incident to the ownership, maintenance or use of any school bus. Such insurance shall be carried only in companies duly licensed and authorized to write such coverage in this state. Every policy for such insurance coverage issued to a school district shall provide, or be endorsed to provide, that the company issuing such policy waives any right to refuse payment or to deny liability thereunder within the limits of said policy, by reason of the non-liability of the insured school district for the wrongful or negligent acts of its agents and employees, and, its immunity from suit, as an agency of the state performing governmental functions."

Thus, under this statute, a person injured by an insured school district bus may recover to the extent of such insurance, whereas, under the *Kinnare* doctrine, a person injured by an uninsured school district bus can recover nothing at all.

Defendant contends that the quoted provision of the School Code constitutes a legislative determination that the public policy of this State requires that school districts be immune from tort liability. We can read no such legislative intent into the statute. Rather, we interpret that section as expressing dissatisfaction with the court-created doctrine of governmental immunity and an attempt to cut down that immunity where insurance is involved. The difficulty with this legislative effort to curtail the judicial doctrine is that it allows each school district to determine for itself whether, and to what extent, it will be financially responsible for the wrongs inflicted by it.

Coming down to the precise issue at hand, it is clear that if the above rules and precedents are strictly applied to the instant case, plaintiff's complaint, containing no allegation as to the existence of insurance, was properly dismissed. On the other hand, the complaint may be held to state a good cause of action on either one of two theories, (1) application of the doctrine of *Moore* v. *Moyle,* 405

Ill. 555, or (2) abolition of the rule that a school district is immune from tort liability.

As to the doctrine of *Moore* v. *Moyle,* that case involved an action for personal injuries against Bradley University, a charitable educational institution. Traditionally, charitable and educational institutions have enjoyed the same immunity from tort liability as have governmental agencies in Illinois. (*Parks* v. *Northwestern University,* 218 Ill. 381.) The trial court dismissed the complaint on the ground that Bradley was immune to tort liability. The Supreme Court reversed, holding that the complaint should not have been dismissed since it alleged that Bradley was fully insured. Unfortunately, we must admit that the opinion in that case does not make the basis of the result entirely clear. (See Note, 45 Ill. L. Rev. 776.) However, the court there said, p. 564: "* * * the question of insurance in no way affects the liability of the institution, but would only go to the question of the manner of collecting any judgment which might be obtained, without interfering with, or subjecting the trust funds or trust-held property to, the judgment. The question as to whether or not the institution is insured in no way affects its liability any more than whether a charitable institution holding private nontrust property or funds would affect its liability. These questions would only be of importance at the proper time, when the question arose as to the collection of any judgment out of nontrust property or assets. * * * Judgments may be obtained, but the question of collection of the judgment is a different matter." If we were to literally apply this reasoning to the present school district case, we would conclude that it was unnecessary that the complaint contain an allegation of the existence of insurance or other nonpublic funds. Plaintiff's complaint was sufficient as it stood without any reference to insurance, and plaintiff would be entitled to prosecute his action to judgment. Only at that time, in case of a judgment for plaintiff, would the question of insurance arise, the pos-

session of nonpublic funds being an execution rather than a liability question. It cannot be overlooked, however, that some doubt is cast on this approach by the last paragraph of the *Moore* opinion, where the court said: "It appears that the trust funds of Bradley will not be impaired or depleted by the prosecution of the complaint, and therefore it was error to dismiss it." These words imply that if from the complaint it did not appear that the trust funds would not be impaired, the complaint should have been dismissed. If that is the true holding in the case, then liability itself, not merely the collectibility of the judgment, depends on the presence of nontrust assets, as was pointed out by Justice Crampton in his dissenting opinion. The doctrine of *Moore* v. *Moyle* does not, in our opinion, offer a satisfactory solution. Like the provision of the School Code above quoted, it would allow the wrongdoer to determine its own liability.

It is a basic concept underlying the whole law of torts today that liability follows negligence, and that individuals and corporations are responsible for the negligence of their agents and employees acting in the course of their employment. The doctrine of governmental immunity runs directly counter to that basic concept. What reasons, then, are so impelling as to allow a school district, as a quasi-municipal corporation, to commit wrongdoing without any responsibility to its victims, while any individual or private corporation would be called to task in court for such tortious conduct?

The original basis of the immunity rule has been called a "survival of the medieval idea that the sovereign can do no wrong," or that "the King can do no wrong." (38 Am. Jur., Mun. Corps., sec. 573, p. 266.) In *Kinnare* v. *City of Chicago*, 171 Ill. 332, the first Illinois case announcing the tort immunity of school districts, the court said: "The State acts in its sovereign capacity, and does not submit its action to the judgment of courts and is not liable for the torts or negligence of its agents, and a corporation created by the State as a mere agency for the more efficient exer-

cise of governmental functions is likewise exempted from the obligation to respond in damages, as master, for negligent acts of its servants to the same extent as is the State itself, unless such liability is expressly provided by the statute creating such agency." This was nothing more nor less than an extension of the theory of sovereign immunity. Professor Borchard has said that how immunity ever came to be applied in the United States of America is one of the mysteries of legal evolution. (Borchard, Governmental Liability in Tort, 34 Yale L. J. 1, 6.) And how it was then infiltrated into the law controlling the liability of local governmental units has been described as one of the amazing chapters of American common-law jurisprudence. (Green, Freedom of Litigation, 38 Ill. L. Rev. 355, 356.) "It seems, however, a prostitution of the concept of sovereign immunity to extend its scope in this way, for no one could seriously contend that local governmental units possess sovereign powers themselves." 54 Harv. L. Rev. 438, 439.

We are of the opinion that school district immunity cannot be justified on this theory. As was stated by one court, "The whole doctrine of governmental immunity from liability for tort rests upon a rotten foundation. It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, 'the King can do no wrong,' should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs." (*Barker* v. *City of Santa Fe*, 47 N.M. 85, 136 P.2d 480, 482.) Likewise, we agree with the Supreme Court of Florida that in preserving the sovereign immunity theory, courts have overlooked the fact that the

Revolutionary War was fought to abolish that "divine right of kings" on which the theory is based.

The other chief reason advanced in support of the immunity rule in the more recent cases is the protection of public funds and public property. This corresponds to the "no fund" or "trust fund" theory upon which charitable immunity is based. This rationale was relied on in *Thomas v. Broadlands Community Consolidated School Dist.* 348 Ill. App. 567, where the court stated that the reason for the immunity rule is "that it is the public policy to protect public funds and public property, to prevent the diversion of tax moneys, in this case school funds, to the payment of damage claims." This reasoning seems to follow the line that it is better for the individual to suffer than for the public to be inconvenienced. From it proceeds defendant's argument that school districts would be bankrupted and education impeded if said districts were called upon to compensate children tortiously injured by the negligence of those districts' agents and employees.

We do not believe that in this present day and age, when public education constitutes one of the biggest businesses in the country, that school immunity can be justified on the protection-of-public-funds theory.

In the first place, analysis of the theory shows that it is based on the idea that payment of damage claims is a diversion of educational funds to an improper purpose. As many writers have pointed out, the fallacy in this argument is that it assumes the very point which is sought to be proved, *i.e.*, that payment of damage claims is not a proper purpose. "Logically, the 'No-fund' or 'trust fund' theory is without merit because it is of value only after a determination of what is a proper school expenditure. To predicate immunity upon the theory of a trust fund is merely to argue in a circle, since it assumes an answer to the very question at issue, to wit, what is an educational purpose? Many disagree with the 'no-fund' doctrine to the extent of ruling that the payment of funds for judgments

resulting from accidents or injuries in schools is an educational purpose. Nor can it be properly argued that as a result of the abandonment of the common-law rule the district would be completely bankrupt. California, Tennessee, New York, Washington and other states have not been compelled to shut down their schools." (Rosenfield, Governmental Immunity from Liability for Tort in School Accidents, 5 Legal Notes on Local Government, 376-377.) Moreover, this argument is even more fallacious when viewed in the light of the Illinois School Code, which authorizes appropriations for "transportation purposes" (Ill. Rev. Stat. 1957, chap. 122, par. 17—6.1), authorizes issuance of bonds for the "payment of claims" (Ill. Rev. Stat. 1957, chap. 122, par. 19—10), and authorizes expenditures of school tax funds for liability insurance covering school bus operations. (Ill. Rev. Stat. 1957, chap. 122, par. 29—11a.) It seems to us that the payment of damage claims incurred as an adjunct to transportation is as much a "transportation purpose" and therefore a proper authorized purpose as are payments of other expenses involved in operating school buses. If tax funds can properly be spent to pay premiums on liability insurance, there seems to be no good reason why they cannot be spent to pay the liability itself in the absence of insurance.

Neither are we impressed with defendant's plea that the abolition of immunity would create grave and unpredictable problems of school finance and administration. We are in accord with Dean Green when he disposed of this problem as follows: "There is considerable talk in the opinions about the tremendous financial burdens tort liability would cast upon the taxpayer. In some opinions it is stated that this factor is sufficient to warrant the courts in protecting the taxpayer through the immunity which they have thrown around municipal corporations. While this factor may have had compulsion on some of the earlier courts, I seriously doubt that it has any great weight with the courts in recent years. In the first place, taxation is not the subject matter

of judicial concern where justice to the individual citizen is involved. It is the business of other departments of government to provide the funds required to pay the damages assessed against them by the courts. Moreover, the same policy that would protect governmental corporations from the payment of damages for the injuries they bring upon others would be equally pertinent to a like immunity to protect private corporations, for conceivably many essential private concerns could also be put out of business by the damages they could incur under tort liability. But as a matter of fact, this argument has no practical basis. Private concerns have rarely been greatly embarrassed, and in no instance, even where immunity is not recognized, has a municipality been seriously handicapped by tort liability. This argument is like so many of the horribles paraded in the early tort cases when courts were fashioning the boundaries of tort law. It has been thrown in simply because there was nothing better at hand. The public's willingness to stand up and pay the cost of its enterprises carried out through municipal corporations is no less than its insistence that individuals and groups pay the cost of their enterprises. Tort liability is in fact a very small item in the budget of any well organized enterprise." Green, Freedom of Litigation, 38 Ill. L. Rev. 355, 378.

We are of the opinion that none of the reasons advanced in support of school district immunity have any true validity today. Further we believe that abolition of such immunity may tend to decrease the frequency of school bus accidents by coupling the power to transport pupils with the responsibility of exercising care in the selection and supervision of the drivers. As Dean Harno said: "A municipal corporation today is an active and virile creature capable of inflicting much harm. Its civil responsibility should be co-extensive. The municipal corporation looms up definitely and emphatically in our law, and what is more, it can and does commit wrongs. This being so, it must assume the responsibilities of the position it occupies in society." (Harno, Tort

Immunity of Municipal Corporations, 4 Ill. L. Q. 28, 42.) School districts will be encouraged to exercise greater care in the matter of transporting pupils and also to carry adequate insurance covering that transportation, thus spreading the risk of accident, just as the other costs of education are spread over the entire district. At least some school authorities themselves have recognized the need for the vital change which we are making. See Editorial, 100 American School Board Journal 55, Issue No. 6, June, 1940.

"The nation's largest business is operating on a blueprint prepared a hundred, if not a thousand, years ago. The public school system in the United States, which constitutes the largest single business in the country, is still under the domination of a legal principle which in great measure continued unchanged since the Middle Ages, to the effect that a person has no financial recourse for injuries sustained as a result of the performance of the State's functions  *  *  *. That such a gigantic system, involving so large an appropriation of public funds and so tremendous a proportion of the people of the United States, should operate under the principles of a rule of law so old and so outmoded would seem impossible were it not actually true." Rosenfield, Governmental Immunity from Liability for Tort in School Accidents, 9 Law and Contemporary Problems 358, 359.

We conclude that the rule of school district tort immunity is unjust, unsupported by any valid reason, and has no rightful place in modern day society.

Defendant strongly urges that if said immunity is to be abolished, it should be done by the legislature, not by this court. With this contention we must disagree. The doctrine of school district immunity was created by this court alone. Having found that doctrine to be unsound and unjust under present conditions, we consider that we have not only the power, but the duty, to abolish that immunity. "We closed our courtroom doors without legislative help, and we can likewise open them." *Pierce* v. *Yakima Valley*

*Memorial Hospital Ass'n,* 43 Wash.2d 162, 260 P.2d 765, 774.

We have repeatedly held that the doctrine of *stare decisis* is not an inflexible rule requiring this court to blindly follow precedents and adhere to prior decisions, and that when it appears that public policy and social needs require a departure from prior decisions, it is our duty as a court of last resort to overrule those decisions and establish a rule consonant with our present day concepts of right and justice. (*Bradley* v. *Fox,* 7 Ill.2d 106, 111; *Nudd* v. *Matsoukas,* 7 Ill.2d 608, 615; *Amann* v. *Faidy,* 415 Ill. 422.) As was stated by the New Jersey Supreme Court in overruling the doctrine of charitable immunity: "The unmistakable fact remains that judges of an earlier generation declared the immunity simply because they believed it to be a sound instrument of judicial policy which would further the moral, social and economic welfare of the people of the State. When judges of a later generation firmly reach a contrary conclusion they must be ready to discharge their own judicial responsibilities in conformance with modern concepts and needs. It should be borne in mind that we are not dealing with property law or other fields of the law where stability and predictability may be of the utmost concern. We are dealing with the law of torts where there can be little, if any, justifiable reliance and where the rule of *stare decisis* is admittedly limited. See Pound, *supra,* 13 N.A.C.C.A.L.J. at 22; Seavey, Cogitations on Torts, 68 (1954); Cowan, 'Torts,' 10 Rutgers L. Rev. 115, 119 (1955)." *Collopy* v. *Newark Eye and Ear Infirmary,* 27 N.J. 29, 141 A.2d 276.

In here departing from *stare decisis* because we believe justice and policy require such departure, we are nonetheless cognizant of the fact that retrospective application of our decision may result in great hardship to school districts which have relied on prior decisions upholding the doctrine of tort immunity of school districts. For this reason we feel justice will best be served by holding that, except as

to the plaintiff in the instant case, the rule herein established shall apply only to cases arising out of future occurrences. This result is in accord with a substantial line of authority embodying the theory that an overruling decision should be given only prospective operation whenever injustice or hardship due to reliance on the overruled decisions would thereby be averted. *Gelpcke* v. *City of Dubuque,* 68 U.S. 175, 17 L. ed. 520; *Harmon* v. *Auditor of Public Accounts,* 123 Ill. 122 (where decision sustaining validity of statute authorizing bond issue is, subsequent to the issue, overruled, overruling decision operates prospectively); *Davies Warehouse Co.* v. *Bowles,* 321 U.S. 144, 88 L. ed 635; *People ex rel. Attorney General* v. *Salomon,* 54 Ill. 39 (where public officers have relied on statutes subsequently held unconstitutional, decision given only prospective operation); *State* v. *Jones,* 44 N.M. 623, 107 P.2d 324 (prospective operation given decision overruling precedent as to what constitutes a lottery); *Continental Supply Co.* v. *Abell,* 95 Mont. 148, 24 P.2d 133 (prospective operation given decision overruling prior cases as to corporate directors' liability to stockholders); *Hare* v. *General Contract Purchase Corp.,* 220 Ark. 601, 249 S.W.2d 973 (prospective operation given decision changing prior rule as to what constitutes usury.) See also: Snyder, Retrospective Operation of Overruling Decisions, 35 Ill. L. Rev. 121; Kocourek, Retrospective Decisions and Stare Decisis, 17 A.B.A.J. 180; Freeman, The Protection Afforded Against the Retroactive Operation of an Overruling Decision, 18 Col. L. Rev. 230; Carpenter, Court Decisions and the Common Law, 17 Col. L. Rev. 593; Note, Prospective Operation of Decisions Holding Statutes Unconstitutional or Overruling Prior Decisions, 60 Harv. L. Rev. 437.

Likewise there is substantial authority in support of our position that the new rule shall apply to the instant case. (*Dooling* v. *Overholser,* (D.C. cir.) 243 F.2d 825; *Shioutakon* v. *District of Columbia,* (D.C. cir.) 236 F.2d 666; *Durham* v. *United States,* (D.C. cir.) 214 F.2d 862; *Barker*

v. *St. Louis County,* 340 Mo. 986; 104 S.W.2d 371; *Far-rior* v. *New England Mortgage Security Co.* 92 Ala. 176, 9 So. 532; *Haskett* v. *Maxey,* 134 Ind. 182, 33 N.E. 358; *Dauchey* v. *Farney,* 173 N. Y. Supp. 530.) At least two compelling reasons exist for applying the new rule to the instant case while otherwise limiting its application to cases arising in the future. First, if we were to merely announce the new rule without applying it here, such announcement would amount to mere *dictum.* Second, and more important, to refuse to apply the new rule here would deprive appellant of any benefit from his effort and expense in challenging the old rule which we now declare erroneous. Thus there would be no incentive to appeal the upholding of precedent since appellant could not in any event benefit from a reversal invalidating it.

It is within our inherent power as the highest court of this State to give a decision prospective or retrospective application without offending constitutional principles. *Great Northern Railway Co.* v. *Sunburst Oil & Refining Co.,* 287 U.S. 358, 77 L. ed. 360.

Although ordinarily the cases which have invoked the doctrine of prospective operation have involved contract or property rights or criminal responsibility, the basis of the doctrine is reliance upon an overruled precedent. Despite the fact that the instant case is one sounding in tort, it appears that the "reliance test" has been met here. We do not suggest that the tort itself was committed in reliance on the substantive law of torts, *i.e.,* the bus driver did not drive negligently in reliance on the doctrine of governmental immunity, but rather that school districts and other municipal corporations have relied upon immunity and that they will suffer undue hardship if abolition of the immunity doctrine is applied retroactively. In reliance on the immunity doctrine, school districts have failed to adequately insure themselves against liability. In reliance on the immunity doctrine, they have probably failed to investigate past accidents which they would have investigated had they

known they might later be held responsible therefor. Our present decision will eliminate much of the hardship which might be incurred by school districts as a result of their reliance on the overruled doctrine, and at the same time reward appellant for having afforded us the opportunity of changing an outmoded and unjust rule of law.

For the reasons herein expressed, we accordingly hold that in this case the school district is liable in tort for the negligence of its employee, and all prior decisions to the contrary are hereby overruled.

The judgment of the Appellate Court sustaining the dismissal of plaintiff's complaint is reversed and the cause is remanded to the circuit court of Kane County with instructions to set aside the order dismissing the complaint, and to proceed in conformity with the views expressed in this opinion.

*Reversed and remanded, with directions.*

Mr. Justice Davis, dissenting:

I dissent from the decision of the court which, in one fell swoop, severs from the body of our Illinois law the ancient and established doctrine of governmental immunity from tort liability. The rule of immunity of the people collectively charged with a governmental function was well established by 1607, the fouth year of James I. (*Russell* v. *Men of Devon,* 2 Term Rep. 671, 100 Eng. Rep. 359.) The rule of decision was adopted prior to the constitution of 1870 and was incorporated in the Revised Statutes of 1874 in its present form. It appears today as section 1 of the act adopting the common law (Ill. Rev. Stat. 1959, chap. 28, par. 1,) and provides: "That the common law of England, so far as the same is applicable and of a general nature, and all statutes or acts of the British parliament made in aid of, and to supply the defects of the common law, prior to the fourth year of James the First, excepting the second section of the sixth chapter of 43rd Elizabeth, the eighth chapter of 13th Elizabeth, and ninth chapter of 37th Henry

Eighth, and which are of a general nature and not local to that kingdom, shall be the rule of decision, and shall be considered as of full force *until repealed by legislative authority."* (Italics mine.)

Section 26 of article IV of the constitution of 1870 provides: "The state of Illinois shall never be made defendant in any court of law or equity." Until this decision Illinois courts have recognized such immunity in both the State and its governmental agencies and these agencies and the legislature have relied upon such decisions.

In our present constitution we find the requirement that the General Assembly of this State shall provide a "thorough and efficient system of free schools, whereby all children of this State may receive a good common school education." (Ill. const. of 1870, art. VIII, sec. 1.) We have said that this provision operates "as a mandate to the legislature to exercise its inherent power to carry out a primary, obligatory concept of our system of government, *i.e.,* the children of the State are entitled to a good common-school education, in public schools, and at public expense." *People* v. *Deatherage,* 401 Ill. 25, 30.

In *Town of Waltham* v. *Kemper,* 55 Ill. 346, at page 351, we stated: "We are satisfied, on principle and authority, the town of Waltham was not liable to this action at common law, and none has been given by statute." We first applied the immunity rule to school districts in 1898 in the case of *Kinnare* v. *City of Chicago,* 171 Ill. 332, on the ground that a school district is "an agency of the State, having existence for the sole purpose of performing certain duties, deemed necessary to the maintenance of 'an efficient system of free schools,'" and, like the State, is exempt from tort liability to the same extent as the State itself, *"unless such liability is expressly provided by the statute creating such agency."* (Italics mine.)

The court erred in its statement that the question of immunity of school districts from tort liability has not been reconsidered for over 50 years. This subject was thor-

oughly considered in *Leviton* v. *Board of Education,* 374 Ill. 594 (1940); and in *Lindstrom* v. *City of Chicago,* 331 Ill. 144 (1928). In these cases, the rule was reiterated that in this State, as generally throughout the nation, school districts are not liable for the torts or negligence of their agents *unless their liability is expressly provided by statute.* Leviton was cited with approval on the immunity question, as recently as 1944, in *Chicago City Bank and Trust Co.* v. *Board of Education,* 386 Ill. 508, 514.

The opinion in the case at bar asserts that "the whole doctrine of governmental immunity rests on a rotten foundation" predicated on the maxim that the "King can do no wrong." The history of the common law in Illinois convincingly rebuts this epithetical charge. The doctrine of governmental immunity in Illinois was not founded upon a blind and unswerving application of the English common law or its maxims. Under our statute, (Ill. Rev. Stat. 1957, chap. 28, par. 1,) the rule of decision embraces more than the common law of England as it existed prior to 1606. We adopted a system of elementary rules and general judicial declarations of principles, which have continually expanded with the progress of society. (*Amann* v. *Faidy,* 415 Ill. 422, 434; *Kreitz* v. *Behrensmeyer,* 149 Ill. 496.) The outstanding characteristic and the glory of our common law is its capacity for growth and adaptability. (*People ex rel. Keenan* v. *McGuane,* 13 Ill.2d 520, 535 and 536; *Bradley* v. *Fox,* 7 Ill.2d 106; *Nudd* v. *Matsoukas,* 7 Ill.2d 608.) However, sound legal doctrine need not be discarded because, in the evolutionary process of development, it may have once been justified by now anachronistic reasoning.

Neither Illinois nor any other State of the United States adopted the theory of governmental immunity from tort liability from the maxim the "King can do no wrong," as it existed in 1606, but rather predicated such immunity on various theories of the common law adaptable to the exigencies, customs, and usages of the people of our various

States, as applicable under the particular governmental practices of each State.

In *Lindstrom*, 331 Ill. 144, at 147 and 148, we stated: "The reason for this rule lies in the fact that a school district of the character here considered is created merely to aid in the administration of the State government. It owns no property, has no private corporate interests and derives no special benefits from its corporate acts. It is simply an agency of the State having existence for the sole purpose of performing certain duties deemed necessary to the maintenance of 'an efficient system of free schools' within its jurisdiction. In creating such district the State acts in a sovereign capacity for the more efficient exercise of governmental functions resting in the State, and such district is exempted from the obligation to respond in damages, as master, for the negligent acts of its servants to the same extent as is the State itself, *unless liability is expressly provided by the statute.* (*Nagle* v. *Wakey*, 161 Ill. 387; *Wilcox* v. *City of Chicago*, 107 id. 334; *Town of Waltham* v. *Kemper*, 55 id. 346.)" (Italics mine.)

McQuillin, in his work on municipal corporations, has stated a justification for the rule of immunity which is widely accepted: "The doctrine * * * is based on the familiar reason that the undertaking is not to promote the private interests of the municipality as a corporate entity, but rather for the public benefit, and in the performance of such obligation the municipality is a mere public agent, either of the state or of the local community. *The reason, as often expressed, is one of public policy, to protect public funds and public property.* 'Taxes are raised for certain specific governmental purposes; and if they could be diverted to the payment of damage claims, the more important work of government, which every municipality must perform regardless of its other relations, would be seriously impaired if not totally destroyed. The reason for the exemption is sound and unobjectionable. * * *' " 18 McQuillin, sec. 53.24. (Italics mine.)

We recognized this rationale in *Leviton* v. *Board of Education*, 374 Ill. 594, at pages 599 and 600, and quoted directly from *Elmore* v. *Drainage Com'rs*, 135 Ill. 269: "The nonliability of the public *quasi* corporation, unless liability is expressly declared, is usually placed upon these grounds: That * * * no corporate funds are provided which can, without express provision of law, be appropriated to private indemnification. Consequently, in such case, the liability is one of imperfect obligation, and no civil action lies at the suit of an individual for non-performance of the duty imposed." This principle of the protection of public funds was likewise recognized in *Thomas* v. *Broadlands Community Consolidated School Dist.* 348 Ill. App. 567.

Other State courts have held that school districts are not liable to pay damages since the funds in their hands have been placed there for the purposes of education only; that school districts are without power to raise money by taxation to pay damages in tort; and that to allow school funds to be used in such manner would be detrimental, and possibly even disastrous, to the public school system. *Finch* v. *Board of Education of Toledo*, 30 Ohio St. 37; *Ford* v. *School District of Kendall Borough*, 121 Pa. 543, 15 Atl. 812; *Freel* v. *School City of Crawfordsville*, 142 Ind. 27, 41 N.E. 312; *Cochran* v. *Wilson*, 287 Mo. 210, 229 S.W. 1050.

Such reasoning finds logical support under Illinois law. School districts are circumscribed in their power to tax. They are authorized by statute to levy certain taxes for educational and building purposes, and in event transportation is furnished, they may levy a given tax for this purpose. (Ill. Rev. Stat. 1957, chap. 122, par. 17—2.) They may issue bonds for the purpose of building or repairing school houses or purchasing or improving school sites, pursuant to the provision of article 19 of the School Code, (Ill. Rev. Stat. 1957, chap. 122, par. 19—2,) and the county clerk shall annually extend taxes against the taxable prop-

erty of the district sufficient to pay the maturing principal and interest on said bonds in accordance with the certified copy of the bond resolution on file in his office. Ill. Rev. Stat. 1957, chap. 122, par. 19—9.

School districts may also issue bonds to pay orders for wages of teachers or claims against the district, (Ill. Rev. Stat. 1957, chap. 122, par. 19—10) ; to pay liabilities or obligations imposed on such districts resulting from a division of the assets where a new district is created from part of the original district, (Ill. Rev. Stat. 1957, chap. 122, par. 19—11.1) ; and to refund an existing legal bonded indebtedness, (Ill. Rev. Stat. 1957, chap. 122, par. 19—16,) and may levy taxes to pay maturing principal and interest thereon. (Ill. Rev. Stat. 1957, chap. 122, par. 19—9.) And in addition to these limitations, a school district cannot become indebted for any purpose in excess of five per cent of the value of the taxable property therein. (Const. of 1870, art. 9, par. 12.) It is elementary law that school districts can levy taxes for only those purposes authorized by the legislature. (*St. Louis, Alton and Terre Haute Railroad Co.* v. *People ex rel. Wolf,* 224 Ill. 155; *Chicago and Alton Railroad Co.* v. *People ex rel. Wolff,* 205 Ill. 625.) They are without power to levy taxes to pay tort judgments, and without such authorization a tax for such purpose would violate section 9 of article IX of the State constitution which proscribes a municipal agency from levying a tax other than for a corporate purpose. *Chicago City Bank and Trust Co.* v. *Board of Education,* 386 Ill. 508; *Leviton* v. *Board of Education,* 374 Ill. 594; *Dimond* v. *Commissioner of Highways,* 366 Ill. 503; *Berman* v. *Board of Education,* 360 Ill. 535.

The relationship of a school district to the State, under section 1 of article VIII of the Illinois constitution, is concisely stated in *People ex rel. Taylor* v. *Camargo Community Consolidated School Dist.* 313 Ill. 321, at page 324: "The appellee is a public municipal corporation created by legislative authority for the purpose of exercising such part of

the governmental powers of the State as the law has confided to it. It is a part of the machinery of government. Its functions are wholly public, and it is merely a local agency of the State for the exercise of those functions. The character of the functions of such municipal corporations, the extent and duration of their powers and the territory in which they shall be exercised rest entirely in the legislative discretion. The governmental powers which they may exercise and the property which they may hold and use for governmental purposes are equally within the power of the legislature. Their powers may be enlarged, diminished, modified, or revoked, their acts set aside or confirmed, at the pleasure of the legislature."

Thus, under existing statutes, school districts have no authority to levy taxes or to issue bonds for the purpose of paying a tort judgment. The statutes which authorize the levy of a tax for transportation purposes and the issuance of bonds to pay claims were adopted when the doctrine of governmental immunity from tort liability was fully recognized by both this court and the legislature, and the suggestion of the court that such levies could be used to satisfy tort judgments is specious indeed.

If tort judgments secured against a school district are to be paid, the legislature alone must authorize their payment and provide a tax rate for the levy of funds for this purpose. Such are the teachings of section 9 of article IX of the Illinois constitution, the School Code, and all the cases heretofore cited.

The pronouncement in *Moore* v. *Moyle,* 405 Ill. 555, and *Thomas* v. *Broadlands Community Consolidated School Dist.* 348 Ill. App. 567, that charitable corporations and school districts are subject to tort liability, to the extent that liability insurance is available to protect the charitable trust fund and the public school fund, is consonant with existing statutes and the decisions of this court heretofore cited.

The court urges that under the legislative effort to ameliorate the burden placed on the individual under the

doctrine of governmental immunity, each school district determines for itself "whether, and to what extent, it will be financially responsible for the wrongs inflicted by it." This criticism of the judgment of the legislature, even if valid, cannot justify this court in imposing its peculiar predilection of sound legislative policy in an area clearly beyond its competence.

Since 1870, the legislature has repeatedly acted to relieve the hardship which may fall upon the individual by virtue of the doctrine of governmental immunity. Governmental agencies, including school districts, are now subject to liability under the Workmen's Compensation and Occupational Disease Acts, (Ill. Rev. Stat. 1957, chap. 48, pars. 138.1, 172.36;) the State, under the Court of Claims Act, is liable for damages in tort up to $7,500 for the negligence of its officers, agents or employees, (Ill. Rev. Stat. 1957, chap. 37, pars. 439.1-439.24;) cities and villages have been made directly liable for injuries caused by the negligent operation of fire department vehicles, and for actionable wrong in the removal or destruction of unsafe or unsanitary buildings (Ill. Rev. Stat. 1957, chap. 24, pars. 1—13, 1—16; cities and villages, and the Chicago Park District, have also been made responsible, by way of indemnification, for the non-wilful misconduct of policemen, (Ill. Rev. Stat. 1957, chap. 24, par. 1—15.1; chap. 105, par. 333.23k;) and under the School Code, any school district which provides transportation may insure against any loss or liability which may arise from or incident to the ownership or operation of the school bus (Ill. Rev. Stat. 1957, chap. 122, par. 29—11a,) and any school districts may insure against loss or liability resulting from the negligent act of any agent, employee, teacher, officer or member of the supervisory staff thereof resulting from the wrongful act of such person in the discharge of his duties within the scope of his employment. Ill. Rev. Stat. 1957, chap. 122, par. 6—35.1.

Thus, in accord with the theme of governmental immunity, unless "liability is expressly provided by statute"

as announced in *Town of Waltham* v. *Kemper*, 55 Ill. 346, in 1870, and as reiterated in *Lindstrom* v. *City of Chicago*, 331 Ill. 144, and the other cases heretofore cited, the limitation of the scope of the doctrine of immunity, with restricted exceptions, has been left to the discretion of the legislature.

I denounce the contention of the court that these legislative limitations on the doctrine of governmental immunity are a justification for its abolition by judicial fiat. The legislature, in restricting the scope of such immunity, is acting in its area of special competence. This court, in abolishing it, has unwisely ventured beyond the range of judicial action.

Justice Holmes, in his lectures entitled "The Common Law," stated that " the life of the law has not been logic, it has been experience." Over the years, our law in connection with governmental immunity has grown and developed in accordance with the experiences, practices, customs and mores of the times. The success and life of our republic are based upon public education. The necessity for such education and the magnitude of its endeavor offer grave reasons why this court should refuse to overturn the precedent of 89 years with reference to governmental immunity. This decision cannot but be the occasion for releasing a flood of litigation and legislation in order to establish new boundaries in this area of novel liability. During this period, school districts will be harassed by doubts and difficulties which will impair their ability to conduct an efficient system of free schools. I regard as appropriate the following language of the United States Supreme Court in *Helvering* v. *Hallock*, 309 U.S. 106, 119, 84 L. ed. 604, 612 : "We recognize that stare decisis embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations."

This decision, while here applicable to school districts, by its pronouncement extends to the State and all of its governmental agencies which have heretofore been within

the purview of the doctrine of governmental immunity. The various statutes which heretofore restricted this doctrine in favor of the individual appear to be overridden by the full sweep of this opinion which, without limitation, overrules all prior contrary decisions and nullifies the immunity doctrine.

If the court is consistent in its future decisions, the immunity of charitable trust funds must likewise fall. I cannot but conclude that the action of the court in striking down this long established doctrine, buttressed by statutes predicated upon its existence, is grave error. We are not writing on a clean slate; we are dealing with the law as established and developed after 89 years of growth. In *Southern Pacific Co.* v. *Jensen,* 244 U.S. 205, 221, 61 L. ed. 1086, 1100, Mr. Justice Holmes, dissenting, stated: "I recognize without hesitation that judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions." In the case at bar, the court has broken the recognized confines of judicial legislation, overruled existing precedent, and has, in effect, repealed the legislative policy and enactments of long standing.

In Federalist No. 78, Alexander Hamilton wrote that courts "must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body." I believe that the court in the case at bar has exercised its will in an area outside the scope of judicial power and has invaded the field of legislative action.

In the recent case of *O'Callaghan* v. *Waller & Beckwith Realty Co.,* 15 Ill.2d 436, we refused to declare that an exculpatory clause in a lease relating to residential property was void as against public policy. At page 441 we stated: "Other jurisdictions have dealt with this problem by legislation. (McKinney's Consol. Laws of N.Y. Ann., Real Property Laws, sec. 234, vol. 49, part 1; Ann. Laws of Mass.,

vol. 6, c. 186, sec. 15.) In our opinion the subject is one that is appropriate for legislative rather than judicial action." This opinion was adopted November 26, 1958, and rehearing was denied January 22, 1959. Thereafter the legislature promptly enacted a statute which declared such clauses in residential leases to be void as against public policy and unenforceable. Ill. Rev. Stat. 1959, chap. 80, par. 15a.

Prior to the decision in the case at bar, the governmental immunity rule in Illinois was in harmony with that of the other States of the Union in the absence of statute, except the State of New York, which adhered to the British rule of liability for acts of the school board itself, while extending immunity to the board for the negligence of its agents or employees. (*Miller* v. *Board of Education,* 291 N.Y. 25, 50 N.E. 2d 529 (1943); *Herman* v. *Board of Education,* 234 N.Y. 196, 137 N.E. 24 (1922); *Wahrman* v. *Board of Education,* 187 N.Y. 331, 80 N.E. 192 (1907); *Williams* v. *Board of Trustees,* 210 App. Div. 161, 205 N.Y.S. 742 (1924). However, even in New York the judicial rule was reinforced by statute (N.Y. Educ. Law, secs. 2560, 3023,) while the rule of liability was established by statute in the States of California and Washington. Calif. Educ. Code Ann. sec. 1007 (Deering 1952); Wash. Rev. Code, sec. 4,08.120 (1951). Illinois is the only State in the United States in which the rule of liability against school districts has been established by court decision.

If reason existed for legislative rather than judicial action to invalidate an exculpatory clause in a lease, as against public policy, as this court held in *O'Callaghan,* then, beyond doubt, the same rule should have been applied by the court in its decision in this case.

The basic wisdom of leaving changes and modifications in the law pertaining to governmental immunity to the action of the legislature is well illustrated here. In the present posture of the law, governmental agencies are subject to liability and judgment in tort actions without any attendant statutory authorization to levy taxes and thereby

raise revenue for such purpose. Such liability should not be imposed upon the State or its governmental agencies without exploring and considering the complicated aspects of its impact, and without authorizing a tax levy and providing a tax rate for such purpose.

The legislature, through committees, hearings, and other of its processes, can adequately inquire into the complicated circumstances attendant upon the establishment of such liability and the raising of taxes for this purpose. These essential functions of investigation and inquiry are vested in the legislative branch of our government and this court is neither practically equipped for such task, nor is it constitutionally authorized to enter upon it.

This opinion was adopted May 21, 1959, and we allowed petition for rehearing at the September, 1959, term. In the original opinion, the court made no reference to whether it would operate retroactively or prospectively. In *Braxon v. Bressler*, 64 Ill. 488, at 493, we stated: "Legislation can only affect the future, but when courts vacillate and overturn their own decisions, the evils may be incalculable. They operate retrospectively, and may often disturb rights which should be regarded as certain and fixed." Consequently, such opinion operated retroactively. Also see: *Grasse v. Dealer's Transport Co.* 412 Ill. 179; *Duke v. Olson*, 240 Ill. App. 198.

Upon rehearing, the court modified its opinion by holding that, except as to the plaintiff in the instant case, the rule of liability should apply only to cases arising out of future occurrences. The inability of the judiciary to practically cope with this problem is demonstrated by the labored efforts of the court to resolve it and the unusual doctrine which the court announced as the solution of the enigma in which it was entangled.

The other jurisdictions, which have given prospective operation to decisions overruling cases long recognized as the law, have largely predicated such result upon the opinion of Mr. Justice Cardozo in *Great Northern Railway Co.* v.

*Sunburst Oil & Refining Co.* 287 U.S. 358, 77 L. ed 360.

It was there held that the choice of whether decisions should be given prospective or retrospective application rested with the judges of the State court and that there was nothing in the United States constitution to preclude the Montana court from providing that its decisions overruling prior cases should be given prospective application only, "whenever injustice or hardship will thereby be averted." The basis of the *Sunburst* doctrine was reliance upon an overruled precedent and ensuing hardship therefrom.

In this case the court recognized that "In reliance on the immunity doctrine, school districts have failed to adequately insure themselves against liability" and "have probably failed to investigate past accidents which they would have investigated had they known they might later be held responsible therefor," and conceded that the reliance test had been met. Yet, the court included within the ambit of its opinion the action of the plaintiff, while the elements of reliance and ensuing hardship were as real and present with this defendant as with other potential defendant school districts which escaped liability by virtue of the prospective application of the court's opinion.

The principle announced by the court is an aborted offspring of the *Sunburst* theory. It is without legal justification other than that the plaintiff should be rewarded for bringing the action, and it has thwarted the reasonable expectations of the well-intentioned governing body of defendant school district. While the court stated that its decision is in accord with a substantial line of authority, the cases cited, other than *Dooling* v. *Overholser,* (D.C. cir.) 243 F.2d 825, and *Barker* v. *St. Louis County,* 340 Mo. 986, 104 S.W.2d 371, offer no support for the result obtained.

Eighteen pupils of defendant school district were riding on its bus on March 10, 1958, when the bus crashed into a culvert which resulted in an explosion of the gasoline tank

whereby most of them were burned and injured. (*Molitor v. Kaneland Community Unit Dist. 302,* 20 Ill. App. 2d 555.) When we consider that under the court's decision only Thomas Molitor can recover even though the other pupils were similarly injured in the same accident, the position of the court becomes even less tenable.

After this opinion was announced on May 21, 1959, and in response to it, the legislature, by an overwhelming vote, adopted five bills granting tort immunity to park districts, (Ill. Rev. Stat. 1959, chap. 105, par. 12.1—1 and par. 491,) counties, (Ill. Rev. Stat. 1959, chap. 34, par. 301.1,) forest preserve districts, (Ill. Rev. Stat. 1959, chap. 57½, par. 3a,) and the Chicago Park District, (Ill. Rev. Stat. 1959, chap. 105, par. 333.2a). It also passed a bill granting limited tort immunity to school districts and non-profit private schools. (Ill. Rev. Stat. 1959, chap. 122, pars. 821-831, incl.) These enactments became effective on divers dates in July, 1959.

In view of this legislation, the decision of the court may be of limited significance relative to the liability of school districts in tort actions. Cf.: *O'Callaghan v. Waller & Beckwith Realty Co.* 15 Ill.2d 436, and Ill. Rev. Stat. 1959, chap. 80, par. 15a; *In re Estate of Day,* 7 Ill.2d 348, and Ill. Rev. Stat. 1957, chap. 3, par. 197, wherein the decisions of this court were annulled by legislative enactment; and *Jencks v. United States,* 353 U.S. 657, 1 L. ed. 2d 1103, and 18 U.S.C. sec. 3500, wherein a decision of the United States Supreme Court was nullified by an act of Congress. See: *Palermo v. United States,* 360 U.S. 343, 3 L. ed. 2d 1287.

The opinion of the court fails to make any reference to the action of the General Assembly concerning the question of tort immunity. This is significant in that we have frequently held that where the legislature has changed the law pending an appeal, the case must be disposed of by the reviewing court under the law as it then exists. (*Fallon v. Illinois Commerce Com.* 402 Ill. 516; *People ex rel.*

*Hanks* v. *Benton*, 301 Ill. 32; *People ex rel. Askew* v. *Ryan*, 281 Ill. 231; *People ex rel. Law* v. *Dix*, 280 Ill. 158.) Thus, I believe the court erred in not reviewing this judgment in the light of the foregoing 1959 amendment to the School Code.

However, this epochal decision will be the source of much confusion and litigation. The statutes passed after the adoption of the opinion and within the last 40 days of the session, restoring the doctrine of immunity to certain municipal agencies, indicate to me that it is, and by future legislation will be, the policy of the legislature to restore governmental immunity in Illinois, subject to such modification as hearings, study and research under the legislative process may indicate desirable.

While this opinion determines the issues before the court, the problems which it has created remain and will continue to plague us until they are justly resolved.

I would affirm the trial and Appellate courts.

Mr. JUSTICE HERSHEY joins in this dissent.

Mr. JUSTICE BRISTOW, concurring in part and dissenting in part:

I concur with the reasoning and the results reached by this court in the case of the instant plaintiff. But the dissenting opinion of Mr. Justice Davis reads the court's opinion as abolishing the immunity of school districts only as to the instant plaintiff but as retaining that immunity as to the other children who were injured with the plaintiff in the same accident. To the extent that the majority opinion is subject to the construction imparted to it by the dissenting opinion, I must withhold assent.

This is a test case brought by a father on behalf of one of his four children, all of whom were injured at the same time and under identical circumstances. It is clear that all of the children, having the same father and next friend and being represented by the same counsel, have identical interests in this appeal, which has been an important test

case. There was a common question of law in the cases of all of the children and it serves the interests of justice to encourage and entertain a test case respecting all of the children.

I would reject any intimation that the court's holding in this case is limited to the named plaintiff and would repel any inference that the court's opinion pretermits the rights of the other children. I also dissent from the court's order denying the leave of the instant plaintiff's brothers and sisters to intervene in this case and request a clarification of the court's present opinion.

With these reservations, prompted by the dissent, I join the majority of the court in its opinion and judgment in this case.